# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41994

KELLI SEVY,                                      )
                                                 )        Coeur d'Alene, April 2015 Term
    Claimant-Appellant,               )
                                                 )        2015 Opinion No. 116
v.                                               )
                                                 )        Filed: December 22, 2015
SVL ANALYTICAL, INC., Employer;                  )
IDAHO STATE INSURANCE FUND,                      )        Stephen Kenyon, Clerk
Surety; STATE OF IDAHO, INDUSTRIAL               )
SPECIAL INDEMNITY FUND,                          )
                                                 )
    Respondents.                      )

Appeal from the Industrial Commission of the State of Idaho.

The decision of the Industrial Commission is <u>affirmed</u>.

Starr Kelso Law Office, Chtd., Coeur d'Alene, for appellant. Starr Kelso argued.

H. James Magnuson, Coeur d'Alene, for respondents SVL Analytical, Inc. and Idaho State Insurance Fund.

Jones, Brower & Callery, PLLC, Lewiston, for respondent State of Idaho, Industrial Special Indemnity Fund. Thomas Callery argued.

_____

HORTON, Justice.

Kelli Sevy appeals from a decision of the Industrial Commission (the Commission). Sevy sustained a work-related injury on October 31, 2006, and contends that she is totally and permanently disabled. The Commission found that Sevy failed to meet her burden of establishing total and permanent disability. Although the Commission found that Sevy was "profoundly disabled," the Commission held that Sevy had failed to demonstrate that the accident contributed to her disability beyond a 2% permanent partial impairment (PPI). Sevy contends that the Commission's decision that she did not suffer disability in excess of her impairment is not supported by substantial and competent evidence. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sevy was born in 1963 and lives in Idaho's Silver Valley. Sevy does not have a GED. She has worked at a number of different jobs over the years: gas station attendant with limited

cashiering responsibilities, food server, dishwasher, and casino positions selling change and dealing blackjack. Beginning in 2004, Sevy was employed by SVL Analytical (SVL) working in the "bucking room," where she prepared soil samples. This job involved lifting and moving buckets and bags of soil and other samples.

Sevy had suffered a number of injuries prior to the industrial accident giving rise to this appeal. When she was seventeen, Sevy injured her shoulder in an automobile accident. This injury has caused her discomfort that comes and goes. In 2000, Sevy suffered a T12 compression fracture as a result of a sledding accident.

In August of 2004, Sevy fell from a scooter and suffered an L2 compression fracture. On September 19, 2004, Dr. Glenn Keiper performed kyphoplasty, which involves injecting cement into the vertebral body to stabilize the fracture. However, the procedure did not relieve Sevy's pain. Dr. Keiper opined that a disc bulge and degenerative disc disease at L4-5 might be causing Sevy's chronic pain symptoms, including low back and leg pain, numbness, and tingling. Sevy returned to her job in the bucking room. However, due to pain, she changed the way she performed her job. She obtained assistance from other employees, and, rather than lifting heavy items, she would slide them across the floor, frequently using a stick with a hook to drag an item.

Dr. Jeffrey Larson took over Sevy's care in 2005 and, following an MRI, found a small portion of extruded cement attached to a portion of her spine at L2, which likely contributed to Sevy's pain. In May of 2006, Sevy returned to Dr. Larson presenting with increasing neck pain, shoulder numbness and tingling, and bilateral arm symptoms. Dr. Larson concluded that she suffered from degenerative disc disease at C5-6 in her neck and recommended a cervical discectomy and fusion at C5-6. Around this time, Sevy began doing lighter duty work in shipping and receiving at SVL working with lighter samples and entering information into the computer.

Sevy underwent the cervical discectomy and fusion at C5-6 on May 15, 2006. Sevy returned to work at SVL following the fusion where she worked on light-duty, mostly checking in light-weight samples and entering data into a computer.

SVL allowed its employees to bring their dogs to work. On October 31, 2006, five months after her fusion at C5-6, Sevy tripped over a co-worker's dog and fell, hitting her head on the floor. Two weeks later, Sevy sought medical care from Dr. Larson. Dr. Larson reported that Sevy had "some pain in her neck that progressed and now she has continuous pain in her neck

and muscle spasms with movement of her neck . . . ." Dr. Larson ordered a CT scan, which showed that the fusion at C5-6 was fractured.

Dr. Larson recommended a revision of the fusion. Following the October 31, 2006, industrial injury, Sevy temporarily returned to work at SVL for a few hours a day doing light-duty work involving labeling samples and paperwork. A revision of the C5-6 fusion was performed on January 19, 2007. At a follow-up appointment on April 24, 2007, Sevy indicated that her neck felt heavy and she continued to have muscle spasms, difficulty lifting heavy objects, and continued knee pain from an earlier injury. She informed Dr. Larson that she was not able to return to work. In his notes, Dr. Larson stated: "I do not think [Sevy] is disabled because of her neck. Her C-spine appears to be healing well. The fusion appears to be healing well . . . I think that she could return to modified duty work in terms of her C-spine where she was lifting 20 to 40 pounds."

Sevy eventually did return to light-duty work in May of 2007, working four hours a day with a twenty to forty pound lifting restriction. On June 4, 2007, SVL indicated that Sevy was to return to working full-time, however Sevy indicated that she was not feeling well and that she had renewed pain in her neck and shoulders. On June 5, 2007, Sevy returned to Dr. Larson, reporting neck pain, pain radiating to her left arm, numbness in her right arm, pain in her left collar bone, and pain in and both shoulders. Sevy told Dr. Larson that she had been "doing fine at work" as coworkers could help her lift buckets of soil. Based on her continued pain, on June 11, 2007, Dr. Larson indicated Sevy could perform light-duty work with the restriction that she was not to lift more than eight pounds. On June 14, 2007, SVL informed Sevy that no light-duty work was available with the new restrictions assigned by Dr. Larson.

On July 10, 2007, Dr. Larson recommended a functional capacity evaluation to more completely determine the nature of work restrictions that should be imposed. Dr. Larson indicated Sevy "seems to have reached maximum on medical improvement in terms of her job injury. Any further treatment of her C-spine from this point will more than likely relate to her pre-existing condition. She agrees with this."

On August 1, 2007, Mark Bengtson, MPT, performed the recommended functional capacity evaluation. Bengtson identified significant limitations in Sevy's ability to perform overhead work, lift more than forty-five pounds, and her need to frequently change positions when seated. Bengtson concluded that Sevy demonstrated functional limitations related to her

pre-existing thoracic and lumbar spine condition. Bengtson noted Sevy reported pain throughout her cervical spine. Although Bengtson clearly identified limitations and restrictions related to Sevy's cervical spine condition, he did not proffer an opinion as to the extent which Sevy's cervical spine limitations were referable to the industrial accident as opposed to her preexisting condition. Ultimately, Bengtson concluded that Sevy could not work at SVL and he recommended light or sedentary work.

On October 3, 2007, at the instance of the State Insurance Fund, Sevy saw Dr. Craig Stevens for an independent medical evaluation. Dr. Stevens concluded that "[t]he incident of October 31, 2006, and subsequent surgery of January 19, 2007, will not result in permanent work restrictions." While her functional capacity evaluation did identify a lifting limitation, Dr. Stevens noted that the restriction was based on the entirety of her lumbar and thoracic conditions, not specifically her cervical condition. Thus, Dr. Stevens concluded there are "[n]o restrictions" which are "pertinent to her cervical condition."

Dr. Stevens concluded that Sevy has a "10% whole person impairment; modified upward . . . for her 2nd cervical fusion to yield a total diagnosis-based impairment of 12% of the whole person." This represented 10% whole person permanent impairment prior to her industrial injury and "the increment in her impairment as a result of the injury and subsequent 2nd surgery upon her cervical spine is determined to be 2% of the whole person." Dr. Stevens based the increased impairment rating on Table 15-7 of the *AMA Guides to the Evaluation of Permanent Impairment, Fifth Edition*, which provides for a 2% upward adjustment of the impairment rating in instances of a repeat cervical fusion.

Sevy stopped working for SVL on October 12, 2007. Sevy filed her worker's compensation complaint on April 11, 2008. As the claim progressed, Dr. Larson wrote on March 9, 2009, that "[a]ny restrictions that [Sevy] may have, and I don't think there are any related to her neck, would relate to the previous condition for which she had surgery done on May 15, 2006. The second surgery was a supplemental fusion at the same level and would not add any restrictions."

From July of 2010 through April of 2011, Sevy worked for the Idaho Child Care Program (ICCP) providing child care for her three young grandchildren. She was paid between $1,200 and $1,300 per month. Aside from her employment with ICCP, Sevy was unable to secure employment.

On November 17, 2011, at the invitation of SVL, Dr. Nancy Collins evaluated Sevy. Dr. Collins concluded, "[i]n my opinion, Ms. Sevy is not totally disabled. She has access to light to light medium level jobs which make up most of the labor force. She does live in a limited labor market but there are light jobs in small rural communities that are regularly available." Dr. Collins continued, "[t]here do not appear to be any physical restrictions for the industrial accident that occurred on October 31, 2006. . . . Ms. Sevy's limitations, both subjective and objective, relate primarily to her low back condition." When evaluating the transferability of Sevy's skills, Dr. Collins used the SkillTRAN program to evaluate the impact of Sevy's restrictions on her access to the labor market. Dr. Collins opined that Sevy was not totally disabled, reasoning that Sevy had "access to light to light medium level jobs which make up most of the labor force."

In February of 2012, Dan Brownell conducted an analysis of employability and disability factors at Sevy's request. Mr. Brownell opined that as a result of the combined effects of the October 31, 2006, industrial accident and Sevy's preexisting conditions, Sevy was totally and permanently disabled under the odd-lot doctrine. Brownell also used the SkillTRAN program in formulating his opinion. He concluded that Sevy was not competitively employable, having lost access to over 99% of her pre-injury labor market.

At the hearing on Sevy's claim, the Referee received testimony from Sevy and Brownell. The Referee considered post-hearing depositions of Jeff Truthan, the designer of SkillTRAN, Bengtson, Dr. Collins, and Dr. Larson. The Referee's recommendation to the Commission concluded that Sevy suffered a 2% PPI rating of the whole person as a result of the industrial accident but that Sevy was not totally and permanently disabled.

On January 9, 2013, the Commission issued its Findings of Fact, Conclusions of Law, and Order. The Commission did not adopt the Referee's recommendation. Based upon Dr. Stevens' report, the Commission concluded that Sevy had a 2% PPI rating referable to her industrial accident and attendant fusion revision, with a 10% PPI rating referable to her pre-existing cervical spine condition. The Commission noted a lack of medical stability for Sevy's L2 kyphoplasty injury and the absence of evidence regarding the extent to which her T12 compression fracture and knee injuries could be rated and concluded that it could not rate the extent of Sevy's PPI due to these conditions.

The Commission then addressed the extent of Sevy's permanent disability, carefully considering both Dr. Collins and Brownell's opinions. The primary basis for Dr. Collins and Brownell's widely diverging opinions as to the extent of Sevy's disability appears to be related to their use of the SkillTRAN program, which does not distinguish between types of reaching limitations. Because Sevy's limitation related solely to overhead lifting, Dr. Collins did not use the reaching limitation when she used the SkillTRAN program. Because of the same limitation, Brownell did. The Commission found that the result was that Dr. Collins understated the extent of Sevy's disability because she did not take into account the impact of the overhead reaching limitation on Sevy's access to the labor market. Likewise, the Commission found that Brownell's incorporation of all reaching limitations in his use of the SkillTRAN program resulted in an overstated assessment of Sevy's disability.

The Commission was unable to assign a numerical rating to Sevy's disability, but found that her "manifold physical injuries, considered in light of her labor market, lack of significant transferable jobs skills and her poor education leave her profoundly disabled, probably in the range of 50-75% of the whole person as of the date of hearing." Because Sevy did not establish she was 100% disabled, the Commission then considered whether she had proved total and permanent disability under the odd-lot doctrine. The Commission found that Sevy did not meet her burden of establishing odd-lot status.

Because the Commission found Sevy to be less than totally and permanently disabled, it then considered the issue of apportionment. The Commission concluded that it was "unable to conclude that except for the addition of a 2% PPI rating, the subject accident did anything to contribute, on a permanent basis, to [Sevy's] disability." Based upon the opinions of Drs. Stevens and Larson, the Commission found that the industrial accident did not result in additional permanent limitations or restrictions and that Sevy had "failed to establish that she has suffered any disability as a result of the subject accident over and above her 2% PPI rating."

Finally, the Commission determined that ISIF was not liable because Sevy was not totally and permanently disabled. The Commission further reasoned that even if Sevy was totally and permanently disabled under the odd-lot doctrine, Sevy could not demonstrate that the industrial accident combined with her pre-existing condition to cause total and permanent disability.

Based on these findings, the Commission determined that Sevy was entitled to compensation for PPI of 2% of the whole person. Sevy's motion for reconsideration was denied on February 14, 2014, and Sevy timely appealed.

## II. STANDARD OF REVIEW

"When reviewing a decision by the Industrial Commission, this Court exercises free review over the Commission's conclusions of law, but will not disturb the Commission's factual findings if they are supported by substantial and competent evidence." *Serrano v. Four Seasons Framing*, 157 Idaho 309, 314, 336 P.3d 242, 247 (2014) (quoting *Knowlton v. Wood River Med. Ctr.*, 151 Idaho 135, 140, 254 P.3d 36, 41 (2011)); *see* I.C. § 72-732. "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Page v. McCain Foods, Inc.*, 145 Idaho 302, 305, 179 P.3d 265, 268 (2008) (quoting *Ewins v. Allied Sec.*, 138 Idaho 343, 346, 63 P.3d 469, 472 (2003)). "This Court views all facts and inferences 'in the light most favorable to the party who prevailed before the Commission.' " *Id.* (quoting *Taylor v. Soran Rest., Inc.*, 131 Idaho 525, 527, 960 P.2d 1254, 1256 (1998)). "This Court will not re-weigh the evidence and '[t]he Commission's conclusions regarding the credibility and weight of evidence will not be disturbed unless they are clearly erroneous.' " *Serrano*, 157 Idaho at 314, 336 P.3d at 247 (alteration in original) (quoting *Knowlton*, 151 Idaho at 140, 254 P.3d at 41).

## III. ANALYSIS

Although Sevy identifies only a single issue on appeal—whether substantial competent evidence supported the Commission's determination that she did not suffer disability in excess of impairment—she advances two distinct arguments in the body of her appellant's brief: (1) The Commission could not rely on Dr. Larson's opinion that the industrial accident did nothing to increase Sevy's permanent limitations after accepting Dr. Stevens' opinion that she had a 2% PPI rating resulting from the industrial accident; (2) there was not substantial and competent evidence supporting the Commission's conclusion that Sevy is not disabled under the odd-lot doctrine. SVL and ISIF request an award of attorney fees pursuant to Idaho Appellate Rule 11.2. We address these issues in turn.

**A. Substantial and competent evidence supports the Commission's determination that Sevy failed to meet her burden of proving disability in excess of impairment resulting from the industrial accident.**

Sevy's primary argument on appeal is that the Commission reached two inherently conflicting conclusions. The Commission concluded, based on Dr. Stevens' examination and report, that Sevy suffered a 2% PPI rating referable to her October 2006 industrial injury. The Commission also concluded that the industrial accident did not result in permanent limitations or restrictions based on Dr. Larson's opinion that Sevy returned to "base line" after the industrial injury without any additional limitations.

Sevy's argument is based on the definition of permanent impairment found in Idaho Code section 72-422. A permanent impairment is defined as,

> any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved . . . . Permanent impairment is a basic consideration in the evaluation of permanent disability, and is a contributing factor to, but not necessarily an indication of, the entire extent of permanent disability.

I.C. § 72-422. A permanent impairment rating "is a medical appraisal of the nature and extent of the injury . . . as it affects an injured employee's personal efficiency in the activities of daily living, such as self-care, communication, normal living postures, ambulation, elevation, traveling, and nonspecialized activities of bodily members." I.C. § 72-424. The inquiry into permanent disability involves a focus on the injured employee's access to the labor market. Permanent disability "results when the actual or presumed ability to engage in gainful activity is reduced or absent because of permanent impairment and no fundamental or marked change in the future can be reasonably expected." I.C. § 72-423. A permanent disability rating "is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors as provided in section 72-430, Idaho Code." I.C. § 72-425.

Sevy argues that Dr. Stevens' conclusion that she sustained a 2% PPI due to the fusion revision resulting from the industrial accident cannot be reconciled with the Commission's adoption of Dr. Larson's opinion that the industrial accident did not result in permanent limitations or restrictions. We recently considered, and rejected, a similar claim that such findings are definitionally inconsistent:

> Claimant argues that, by definition, if he had a 3% impairment as found by the Commission, then he must have physical limitations and restrictions.
>     The evaluation of a claimant's permanent impairment rating is "a medical appraisal of the nature and extent of the injury or disease as it affects an injured employee's personal efficiency in the activities of daily living, such as self-care,

8

communication, normal living postures, ambulation, elevation, traveling, and nonspecialized activities of bodily members." I.C. § 72-424. The limitations or restrictions to which the Commission referred were limitations or restrictions as to the type of work (e.g., light duty work or work that does not require bending, twisting, sitting, or lifting more than a specified weight) that Claimant could do in order to prevent re-injury or worsening Claimant's condition. Those restrictions can limit the claimant's opportunities for gainful employment. However, the existence of an impairment rating based upon an evaluation of how a compensable injury impacted Claimant's personal efficiency in the activities of daily living does not necessarily mean that the claimant had restrictions or limitations as to the type of employment activities in which the claimant could engage. Whether an injury resulting in a permanent impairment also requires restrictions or limitations depends upon the facts of the case. For example, in *Rivas v. K.C. Logging*, 134 Idaho 603, 7 P.3d 212 (2000), we upheld a determination that the claimant had a 1% impairment but no restrictions regarding his ability to continue working at his regular occupations. *Id.* at 608–09, 7 P.3d at 217–18. Even the existence of restrictions or limitations would not require a finding of a disability in excess of impairment. [*McCabe v. Jo Ann Stores, Inc.*, 145 Idaho 91, 96, 175 P.3d 780, 785 (2007)] (post-accident medical restrictions of only occasional bending, twisting, sitting, and overhead activities and no lifting anything over 25 pounds did not, as a matter of law, require a finding of a disability in excess of the claimant's 7% impairment rating).

"[A] permanent disability rating need not be greater than the impairment rating if, after consideration of the non-medical factors in I.C. § 72–425, the claimant's 'probable future ability to engage in gainful activity' is accurately reflected by the impairment rating." [*Graybill v. Swift & Co.*, 115 Idaho 293, 294, 766 P.2d 763, 764 (1988)].

*Fairchild v. Kentucky Fried Chicken*, 159 Idaho 208, 213–14, 358 P.3d 769, 774–75 (2015).

"The burden of proof is upon the claimant to prove disability in excess of [her] impairment rating." *Warren v. Williams & Parsons PC CPAS*, 157 Idaho 528, 540, 337 P.3d 1257, 1269 (2014) (quoting *Seese v. Ideal of Idaho, Inc.*, 110 Idaho 32, 34, 714 P.2d 1, 3 (1985)). This Court has "long rejected the assertion that whenever a permanent physical impairment rating is given, the disability rating must exceed the impairment rating." *McCabe v. Jo Ann Stores, Inc.*, 145 Idaho 91, 96, 175 P.3d 780, 785 (2007).

The Commission concluded that Sevy suffered a 2% PPI based primarily on Dr. Stevens' report. In reaching its conclusion that Sevy suffered a 2% PPI, the Commission dismissed Dr. Larson's opinion that the fusion revision did not result in additional impairment. The Commission found Dr. Larson's opinion not to be persuasive because Dr. Larson was not asked to explain how he reached this conclusion, although it is clear that his view was on the absence of additional restrictions resulting from the revision of the cervical fusion. The Commission

9

noted that Dr. Stevens' opinion was based upon the AMA Guides, which establish a 10% PPI rating for a cervical fusion, and provide that a second fusion requires that the rating be "modified upward by category IV-E-1 for her 2nd cervical fusion to yield a total diagnosis-based impairment of 12% of the whole person." Simply stated, the AMA Guides provide for an increased PPI rating of 2% simply because the second operation was performed without regard for any resultant limitations or symptomology. The Commission found that Dr. Stevens' report persuasively demonstrated the basis for a 12% PPI rating with 2% being apportioned to the subject accident and 10% being apportioned to Sevy's pre-existing conditions.

When it evaluated the result of the accident on Sevy's disability, the Commission found the opinion of Dr. Larson, Sevy's treating physician, to be persuasive. Dr. Larson testified that the fusion revision returned Sevy to her baseline pre-injury condition without additional limitations that could be referred to the industrial accident. Dr. Stevens also concluded that Sevy's industrial accident and the fusion revision "will not result in permanent work restrictions," as all work restrictions were based entirely on her lumbar and thoracic conditions, not her cervical injury. The Commission considered Bengtson's opinion that some of Sevy's limitations and restrictions were attributable to her cervical spine condition. However, the Commission observed that Bengtson could not explain whether these restrictions were related to Sevy's pre-existing cervical condition and 2006 surgery or whether they were related to her fusion revision. The Commission's conclusion regarding the credibility of and weight of Dr. Larson's testimony is not clearly erroneous and will not be disturbed. This testimony provided substantial competent evidence supporting the Commission's finding that Sevy failed to meet her burden of showing permanent disability in excess of impairment.

## B. Substantial and competent evidence supports the Commission's conclusion that Sevy failed to meet her burden of proving total and permanent disability.

Sevy also contends that there is not substantial competent evidence supporting the Commission's determination that she was not totally and permanently disabled. "There are two ways in which a claimant can establish a total and permanent disability: (1) by proving that his or her medical impairment and non-medical factors caused him or her to become 100% disabled; or (2) by proving that he or she is an odd-lot employee." *Magee v. Thompson Creek Mining Co.*, 142 Idaho 761, 764–65, 133 P.3d 1226, 1229–30 (2006).

Sevy made only a passing reference to the first method in her opening brief and we can be equally succinct. The Commission correctly focused on the results of Dr. Collins and

Brownell's use of the SkillTRAN programs when formulating their opinions. The limitations of that program were such that a reliable number could not be attached to the degree which Sevy was foreclosed from participating in the labor market, but that she was not 100% disabled. We find that substantial competent evidence supports this determination.

The Commission also concluded that Sevy failed to meet her status as an odd-lot employee. The odd-lot doctrine expands disability by recognizing that total disability does not mean "the injured person must be absolutely helpless or entirely unable to do anything worthy of compensation" but "[a]n employee who is so injured that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist may well be classified as totally disabled." *Bybee v. State, Indus. Special Indem. Fund*, 129 Idaho 76, 81, 921 P.2d 1200, 1205 (1996) (quoting *Arnold v. Splendid Bakery*, 88 Idaho 455, 463, 401 P.2d 271, 276 (1965)). The claimant bears the burden of proving a prima facie case of odd-lot status, which requires: (1) that the claimant "attempted other types of employment without success;" or (2) that the claimant, "or vocational counselors or employment agencies on his or her behalf, have searched for other work and other work is not available; or (3) that any efforts to find suitable employment would be futile." *Gooby v. Lake Shore Mgmt. Co.*, 136 Idaho 79, 83, 29 P.3d 390, 394 (2001).

Under the first method, Sevy was required to show that she attempted other types of employment without success. The evidence shows that Sevy worked forty hours per week for ICCP for about eleven months and earned over $1,200 per month to care for her daughter's three children. Sevy's employment ended with ICCP because her daughter was incarcerated. Sevy indicated that had her daughter not been incarcerated, she would still be working for ICCP.[1] We find that substantial competent evidence supports the Commission's finding that Sevy is not an odd-lot worker under the first prong because she successfully obtained employment after recovering from the industrial accident.

Under the second method, Sevy was required to show that she, or others on her behalf, searched for work and that none is available. Sevy indicated that she did not start looking for

---

[1] Sevy testified:

> Q [Counsel for ISIF]: If, in fact, your daughter hadn't been incarcerated and had kept her job at the Conoco station, you'd still be working for ICCP, correct?
> A: Yes.
> Q: And you'd still be making 12 to $1300 a month, wouldn't you?
> A: Yes.

11

work until November of 2011, after her daughter was incarcerated and she lost her job with ICCP. At the time of hearing, Sevy was not looking for work because she was caring for her grandchildren. There is substantial and competent evidence to support the Commission's conclusion that Sevy does not qualify under the second method for the odd-lot doctrine as she failed to show that she did more than conduct a cursory work search.

Finally, under the third method, Sevy was required to show that any effort to find suitable employment would be futile. Brownell opined that Sevy "has lost the ability to be successfully and competitively employed" and that "searching for future employment would be futile." However, Brownell also indicated that Sevy was limited to, but could perform, light to sedentary work. Dr. Collins agreed that Sevy could perform sedentary and light duty work. The Commission's conclusion that it would not be futile for Sevy to search for employment is supported by substantial competent evidence.

For these reasons, we must affirm the Commission's determination that Sevy failed to meet her burden of establishing that she was totally and permanently disabled. This determination dictates that we affirm the Commission's determination that ISIF was not liable. To recover benefits from ISIF, the claimant must satisfy the requirements of Idaho Code section 72-332(1). *Bybee*, 129 Idaho at 79, 921 P.2d at 1203. This Court has held that this requires the claimant to show: "(1) a pre-existing impairment; (2) that pre-existing impairment was manifest; (3) that pre-existing impairment was a subjective hindrance to employment; and (4) the pre-existing impairment and the subsequent injury combined to result in total and permanent disability." *Hope v. Indus. Special Indemn. Fund*, 157 Idaho 567, 571, 338 P.3d 546, 550 (2014) 2014); *see Bybee*, 129 Idaho at 80, 921 P.2d at 1204. Thus, before the Commission may apportion liability to ISIF under Idaho Code section 72-332, there must be a finding that the claimant is totally and permanently disabled. *Hope*, 157 Idaho at 571, 338 P.3d at 550. Because we conclude there is substantial and competent evidence to support the Commission's conclusion that Sevy is not totally and permanently disabled, we conclude that the Commission properly concluded that ISIF is not liable.

## C. We do not award attorney fees on appeal.

SVL requests attorney fees on appeal pursuant to Idaho Appellate Rule 11.1. SVL argues that it is entitled to fees because Sevy's appeal is not reasonably grounded in fact or law and was filed for an improper purpose. Idaho Appellate Rule 11.1 no longer pertains to attorney fees,

"I.A.R. 11.1 was renumbered to I.A.R. 11.2" effective July 1, 2009. *Warren v. Williams & Parsons PC CPAS*, 157 Idaho 528, 541 n.2, 337 P.3d 1257, 1270 n.2 (2014). However, given SVL's citation to *Shriner v. Rausch*, 141 Idaho 228, 108 P.3d 375 (2005) and *Frank v. Bunker Hill Co.*, 142 Idaho 126, 124 P.3d 1002 (2005), both of which address an award of attorney fees for appeals not reasonably grounded in fact or law or filed with an improper purpose under I.A.R. 11.1 prior to renumbering, we are confident SVL intended to raise the issue under I.A.R. 11.2 and we will accordingly address their request. *See, e.g., Warren*, 157 Idaho at 541, 337 P.3d at 1270; *Giles v. Eagle Farms, Inc.*, 157 Idaho 650, 658, 339 P.3d 535, 543 (2014). ISIF also requests attorney fees under I.A.R. 11.2.

"Generally, this Court does not award attorney fees in appeals by claimants from decisions of the Industrial Commission." *Rivas v. K.C. Logging*, 134 Idaho 603, 609, 7 P.3d 212, 218 (2000). However, if this Court determines that, in bringing an appeal, the party has violated Idaho Appellate Rule 11.2, this Court must impose sanctions, which may include attorney fees. *Id.* Under the Rule:

> Every notice of appeal, petition, motion, brief and other document of a party represented by an attorney shall be signed by at least one (1) licensed attorney of record of the state of Idaho . . . The signature of an attorney or party constitutes a certificate that the attorney or party has read the notice of appeal, petition, motion, brief or other document; that to the best of the signer's knowledge, information, and belief after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If the notice of appeal, petition, motion, brief, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the notice of appeal, petition, motion, brief or other document including a reasonable attorney's fee.

Thus, attorney fees may "be awarded as sanctions when a party or attorney violates either (a) the frivolous filings clause, *or* (b) the improper purpose clause." *Sims v. Jacobson*, 157 Idaho 980, 987, 342 P.3d 907, 914 (2015). In *Sims*, this Court noted the departure from imposing sanctions under the Rule only if the signing attorney violated both clauses and explained that "[s]anctions are now awardable independently under either clause in I.A.R. 11.2." *Id.* at 987, 342 P.3d at 914;

*see also Flying A Ranch, Inc. v. Bd. of Cnty. Comm'rs of Fremont Cnty.*, 156 Idaho 449, 453–54, 328 P.3d 429, 433–34 (2014).

Here, neither ISIF nor SVL offers argument that Sevy brought this appeal for an improper purpose. Both assert that this appeal was brought as an attempt to re-try this case before this Court and as such, that Sevy's arguments are not warranted by existing law and do not offer a good faith argument for the modification of existing law.

"An appeal is brought without reasonable basis where the appellant simply asks this Court to 'reweigh the evidence presented to the Commission, and implicitly, to substitute our view of the evidence for that of the commission.' " *Mazzone v. Texas Roadhouse*, 154 Idaho 750, 762, 302 P.3d 718, 730 (2013)(quoting *Gibson v. Ada Cnty. Sheriff's Office*, 147 Idaho 491, 497, 211 P.3d 100, 106 (2009)). However, when an appeal is brought for reasons beyond merely asking this Court to reweigh the evidence, this Court generally does not impose sanctions. *Id.*

Here, Sevy makes an argument that the Commission failed to correctly apply the statutory definitions of "permanent impairment" and failed to undertake a proper permanent disability analysis. While we ultimately find this argument to be without merit, we conclude that given the statutory interplay and Sevy's arguments regarding the effect of a finding of a 2% PPI without a finding of disability, this argument presented a good faith argument warranted by existing law. On appeal Sevy did more than simply ask this Court to reweigh the evidence. For these reasons, we decline to award attorney fees to ISIF and SVL.

### IV. CONCLUSION

We affirm the decision of the Commission. Costs on appeal to Respondents.

Justices EISMANN and BURDICK, **CONCUR**.

J. JONES, Chief Justice, concurring.

I concur in the Court's opinion but write separately to express continuing concern about the Industrial Commission's handling of some of the decisions made by its referees. In a number of worker's compensation cases that have recently come before the Court, the Commission has summarily discarded the referee's findings of fact, conclusions of law and recommendation, and made its own. The Commission is not bound by the referee's decision but the Commission rarely explains why it has made a differing determination of a case that was actually heard by a referee.

This case was heard by Referee Douglas Donahue, who issued his findings of fact, conclusions of law, and recommendation on December 17, 2012. However, on January 9, 2013,

14

the Commission entered its own findings of fact, conclusions of law and order, stating "[t]he undersigned Commissioners have chosen not to adopt the Referee's recommendation." The Commission's decision does not indicate that any specific findings of the Referee were adopted or incorporated by the Commission. As it turns out, the result for the Claimant was basically the same but the Commission tweaked the Referee's finding as to the Claimant's credibility and arrived at its conclusions based upon somewhat different factual and legal analyses.

The Commission's analysis of a case can certainly depart from that of a referee. The Commission is not necessarily bound to the factual findings of the referee, but when its factual findings differ the Commission should explain the reasons for the departure. Although the Commission has its own procedural rules and is not bound by the Idaho Administrative Procedure Act (IDAPA), there is no reason why the Commission should not observe accepted practice for IDAPA proceedings where the administrative agency employs the services of a hearing officer. In *Pearl v. Idaho State Bd. of Medicine*, 137 Idaho 107, 112, 44 P.3d 1162, 1167 (2002), the Court noted, "there is authority for courts to impose on the agency an obligation of reasoned decision making that includes a duty to explain why the agency differed from the administrative law judge." And, in *Pines v. Idaho State Bd. of Medicine*, 158 Idaho 745, 750−51, 351 P.3d 1203, 1208−09 (2015), we said, "The Board [of Medicine] does not need to accept the hearing officer's factual determinations. *Pearl*, 137 Idaho at 114, 444 P.3d at 1169. But, where the Board's findings disagree with those of the hearing officer, we more closely scrutinize those findings, and the Board has a duty to explain why its findings differ." Here, the Commission offered no reasons for its decision to jettison the Referee's findings and decision.

Were this the only case where the Commission disregarded a referee's findings and conclusions, it might not be a matter of concern. However, counsel in a number of recent cases have stated in oral argument that there has been an increase in such instances and the Court has heard at least three other such cases within the last several months. In response to an inquiry during argument in this case, as to whether there was an increase in the number of cases where the Commission disregarded a referee's decision, counsel for ISIF responded, "Yes, and there are, there frankly are a number of decisions in which the Commission is 360 degrees from the original referee's decision. It is not unusual." In response to an observation that it was "a little bit troubling" for the Commission to disregard the referee's decision "without saying why they did

it," counsel responded: "I would, I would agree with the court. . . . There's a number of cases where they've completely reversed the referee and written a completely different decision."

Counsel for the Claimant then stated:

Justice Jones, I would like to address your inquiry to counsel. I would encourage the Court to look at the Industrial Commission decisions in *Davis v. U.S. Silver* [I.C. 2008−031273]. In *Davis*, the referee entered proposed findings of fact and conclusions of law and recommended order and found 100 percent for the injured worker, Mr. Davis, and awarded attorneys fees. The Commission then took that decision from the referee, and did not adopt it, and denied all benefits to the injured worker. That decision was signed by the employer representative and the attorney representative. It was not signed by the employee representative. There was a motion for reconsideration filed from the Commission's decision. The order on the reconsideration reversed the Commission's decision, granted all benefits to the injured worker and left out attorneys fees. And it was signed only by the employee representative and attorney representative.

Of further concern, was Claimant's counsel's report regarding a panel of Commission referees at a State Bar function:

There was a court reporter who took a video of the discussion at the State Bar with the compensation section at the end of February of a panel of referees. And they were talking about cases being taken away from them and I would encourage you to get a copy of that. I can provide you a copy of it if you wish. I mean, the court reporter is out of Boise and it's very enlightening as to what the process is. Essentially, the referee's decision comes in, the Commissioners look at it and they want to make whatever changes they want, and then they specifically said that the Commissioners always give the referee the opportunity to sign the changed opinion. If they don't, then they'll issue their own. One referee, Referee Marsters, as you see in the video, made the comment that the decision goes there and they make changes for whatever perception they have and sometimes for policy reasons. And, you know, it just baffled me. I wasn't present to ask a follow-up question. I reviewed the video. But I am unclear what a policy reason is. There's statutes and there's case law. Is there some other policy reason?

If Commissioners are urging or pressuring referees to change their decisions, it is a certainly a matter of concern. The referee's decision should be filed as written so that his or her credibility determinations are preserved in the record. A referee, just like any other hearing officer, acts as the eyes and ears of the agency. When the Commissioners do not see or hear the witnesses testifying, they are necessarily reliant upon the referee to make findings on a range of issues, many of which hinge upon determinations of observational credibility.[2] Those findings should not be changed without explanation by the Commission.

---

[2] In *Knowlton v. Wood River Med. Ctr.*, 151 Idaho 135, 144, 254 P.3d 36, 45 (2011), the Court said:

16

Here, the Referee and the Commission both determined that the Claimant suffered partial permanent impairment of 2% of the whole person for the October 2006 industrial injury, but was not entitled to a disability rating exceeding the 2% PPI rating for that injury. The principal difference between the Referee and the Commission was the extent of Claimant's preexisting disability (43%, according to the Referee, and 50−75%, according to the Commission). Regardless of this difference, the outcome recommended by the Referee was essentially the same as that which was ordered by the Commission.

The more concerning part of the Commission's order has to do with determining the credibility of the Claimant at the hearing. The Referee, who conducted the hearing, concluded: "Claimant is credible. Her demeanor and testimony were consistent with the other evidence in the record." However, without personally observing the Claimant as she testified, the Commissioners concluded: "Except as qualified below, Claimant is generally credible. The Commission finds no reason to disturb the Referee's findings and observations on Claimant's presentation or credibility." It is unknown how the Commission could reach the conclusion in the second sentence because it discarded the Referee's decision and does not appear to have explicitly adopted or incorporated his finding on credibility or any other issue.

The Commission then appears to contradict the Referee's credibility finding in two respects. First, the Commission says "we have found that Claimant's testimony concerning the significant worsening of her condition following the subject accident should be given less weight than the opinions of Drs. Stevens and Larson." Then, the Commission states: "We find Claimant's testimony that she experienced a permanent worsening of her condition following the October 31, 2006 accident to be unpersuasive." These appear to be observational credibility determinations, at least in part. It is unclear how the Commission, not having attended the hearing, could find contrary to the Referee's credibility finding. Had the ultimate outcome of the

Determining the credibility of witnesses and evidence is a matter within the province of the Commission . . . When analyzing the Commission's findings regarding credibility, this Court has bifurcated the issue into two categories, "observational credibility" and "substantive credibility." Observational credibility "goes to the demeanor of the appellant on the witness stand and it requires that the Commission actually be present for the hearing in order to judge it." *Id* In contrast, substantive credibility "may be judged on the grounds of numerous inaccuracies or conflicting facts and does not require the presence of the Commission at the hearing." (citations omitted).

17

case turned upon the issue of Claimant's credibility, I would have voted to vacate and remand. Since it did not have a discernible bearing on the outcome, I can concur in the opinion.

Justice W. JONES CONCURS.