# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45674

| | | |
|---|---|---|
| KEVIN R. SMITH, | ) | |
| | ) | |
| Claimant-Appellant, | ) | |
| | ) | Lewiston, April 2019 Term |
| v. | ) | |
| | ) | Filed: June 7, 2019 |
| STATE OF IDAHO, INDUSTRIAL | ) | |
| SPECIAL INDEMNITY FUND, | ) | Karel A. Lehrman, Clerk |
| | ) | |
| Defendant-Respondent. | ) | |
| | ) | |

Appeal from the Industrial Commission of the State of Idaho.

The Industrial Commission's order is affirmed.

Starr Kelso Law Office, Coeur d'Alene, for appellant. Starr Kelso argued.

Jones, Brower & Callery, PLLC, Lewiston, for respondent. Thomas W. Callery argued.

_____

BRODY, Justice.

Kevin Smith appeals from an order of the Idaho Industrial Commission that concluded the Idaho Industrial Special Indemnity Fund (ISIF) was not liable to him for worker's compensation benefits. The Commission determined that Smith failed to prove he was totally and permanently disabled under both the 100% method and the odd-lot worker method. He also appeals from a motion for reconsideration that was denied by the Commission, where he alleged that the Commission determined disability at a future date rather than the date of the hearing, that it improperly interpreted a report, and that it improperly considered an excluded exhibit. We affirm the Commission's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In July 1997, a second-story balcony railing Kevin Smith was leaning on gave way, plunging him towards the ground and fracturing both his heels. Dr. Edward Tapper performed surgery on Smith's left heel and put casts on both feet. Smith could not walk for over a year, nor

1

could he work in general construction as he was doing before the accident. A few months after the injury, Smith was evicted from his apartment and was forced to live in a car with his wife and infant.

After his injuries healed he continued experiencing pain in his heels, leading him to realize that he would be unable to work at a job that required copious amounts of standing and walking, so he set out to become a plumber. He obtained employment as an apprentice and eventually become a skilled plumber. Smith discontinued follow-up appointments for his heels with Dr. Tapper in 1998 upon moving to Reno, Nevada, where he continued working as a plumber. While working in Reno, Smith consistently worked as a plumber but changed employers frequently.

Not wanting to raise a family in Reno, Smith moved his wife and two children to Coeur d'Alene, Idaho, in 2006, and began working as a service manager for a plumbing company. A couple months into employment, Smith slipped on ice while working and injured his left wrist. Dr. Richard Mattis with North Idaho Physicians diagnosed Smith with a left wrist sprain accompanied by a possible fracture, treating him with pain medications and a splint. Smith returned to work on light duty but continued having pain in his left wrist and fingers. After physical therapy failed to relieve the pain, he was referred to Dr. Peter Jones, a hand and wrist surgeon, who opined that exploratory surgery of the wrist was needed. Dr. Joseph Welch, a plastic surgeon, conducted a review of Smith's injury and suggested that surgery not be undertaken until the wrist had a longer time to heal. Nevertheless, in July of 2007, Dr. Jones performed surgery on Smith's wrist and removed a fracture fragment.

After Smith's surgery, his employer no longer had a need for his position and fired him. Smith attempted a small plumbing repair in his own home after recovering and discovered that he could hardly use a screwdriver without pain in his wrist. Dr. Jones noted that Smith was struggling with depression after his wrist injury because of apparent concerns of future employability. Smith underwent an independent evaluation with Dr. Brinkman, a plastic surgeon, who recommended that Smith see a psychologist for treatment of depression. Smith was authorized by the employer's insurance for five psychiatric visits with Dr. David Wait, who diagnosed Smith with "major depression, single episode, severe." Dr. Wait noted that it appeared Smith's depression stemmed from "his current inability to work," and suggested individual

therapy and antidepressants as treatment. Smith was prescribed Celexa and referred to a licensed clinical professional counselor, Emily Hart, meeting with her three times.

On December 12, 2007, Dr. Welch conducted an independent medical examination on Smith and determined that his wrist was now fixed and stable, and that his left upper extremity had a 9% permanent impairment. Dr. Welch also observed that Smith's severe depression was likely a result of his wrist injury, and that he would not be able to return to work without his psychiatric issues first being addressed. After this examination, Smith's worker's compensation benefits exhausted and he was referred to the Idaho Department of Health and Welfare Regional Mental Health Services for psychiatric care. He began treatment with Regional Mental Health Services in February 2008 for major depression disorder. He began receiving counseling and treatment for depression by Dr. Rhodes and other licensed counselors.

In May 2008, still unemployed and being treated for depression, Smith became violently angry with his wife during a marital dispute. He was arrested and taken to the hospital on a police hold. Dr. Eric Heidenreich performed a psychiatric evaluation, determined he was depressed, and released him after a day. Smith denied any use of illegal substances when asked, but tested positive for marijuana while in the care of the hospital.

Smith continued treatment with Regional Mental Health Services after this incident, but he began harboring significant resentment and anger towards his wife for calling the police during their dispute, and for not working at a job that paid well through his unemployment. He was also not satisfied with the medicine the psychiatrist was prescribing, trying five different medications and rejecting them all. In August 2008, Dr. Marie Parkman, a psychologist, prepared a report concerning Smith's treatment at Regional Mental Health Services and concluded that he had not progressed very far in his treatment. She opined that he was having difficulties with major depression and ongoing panic attacks because of difficulties in personality functioning. She also stated that he would be a good candidate for vocational rehabilitation because of his above-average intelligence, but his ongoing litigation was complicating his recovery from depression. In her report, Dr. Parkman also noted that Smith was untruthful about his marijuana use because he reported only smoking marijuana as a teenager, but tested positive for marijuana in his urine twice and thereafter confessed that he received a ticket in Oregon for possession of marijuana. She believed that marijuana use was probably exacerbating Smith's mood difficulties.

On October 27, 2008, a hearing was held before Referee Alan Taylor with the Industrial Commission of the State of Idaho to determine whether Smith was entitled to benefits for psychological injuries from his wrist accident pursuant to Idaho Code section 72-451. Kevin Smith testified at the hearing, and a June 25, 2008 deposition was introduced as an exhibit. Through Smith's testimony, it was revealed that he had been untruthful towards many of his health care providers. Specifically, he failed to tell providers—and lied during his deposition—that he had served in the U.S. Army and had been dishonorably discharged due to marijuana use. Smith also admitted that he told providers that he had done drugs in Holland, when he has never actually been to Holland. He also had been untruthful to Dr. Wait about substance abuse because he "didn't open up fully to him." He also admitted that he was not being honest at all with his counselor Emily Hart because he thought her attractive and wanted to impress her with a fantasy alter-ego, telling her that he had changed his name, that he had done exciting things in Holland, and that he had a history of committing crimes.

After the hearing, a deposition was conducted of the Employer/Surety's psychologist, Dr. Ronald Klein. The deposition was thereafter admitted, along with a psychological evaluation of Kevin Smith. In Dr. Klein's report, he concluded that "[t]he depressive symptomatology noted by treaters and IME evaluators alike is not a product of his wrist injury . . . They have been characteristic of his functioning for the past 20 years." Instead of diagnosing him with major depression like most other treaters, Dr. Klein diagnosed Smith with adjustment disorder and mixed personality disorder with emotionally dependent and narcissistic features. He explained that Smith functions like a maladjusted child and is "impulsive, self-focused, oblivious to other's needs, and irritated at being held accountable for his actions." Dr. Klein further explained that Smith tells falsehoods because he reacts to the impulse of the moment. Smith's self-perception in life centers around four main failure experiences: (1) his dishonorable discharge from the Army; (2) his heel injury in 1997; (3) his wrist injury in 2007; and, (4) his arrest in 2008 wherein he tore up his home. In Dr. Klein's opinion, the reason Smith was suffering from depression and not working was because he "has something to pin his failure in life on." Ultimately, Dr. Klein concluded that "[t]he 'therapy' for [Smith] is to get him back to work, either by re-offering vocational assistance or by closing his claim and thereby creating an incentive to resume work."

Dr. Tim Rehnberg, a psychologist hired by Smith, also reviewed medical records and conducted interviews with Smith, diagnosing him with adjustment disorder with anxiety and

4

chronic depressed mood, pain disorder, and mixed personality disorder. His opinion was that Smith's wrist injury had a causal relationship with his psychological condition, and that he had no substance abuse issues at the time of testing. During his deposition, Dr. Rehnberg admitted that he did not review the entirety of Smith's medical records. While he thought Smith was definitely immature, he thought that Dr. Klein's use of the term "maladjusted child" was harsh. Dr. Rehnberg also stated that he thought Smith was young and smart enough that he should be in vocational rehabilitation, and that returning to work would alleviate a number of Smith's problems.

On April 27, 2009, Referee Alan Taylor recommended to the Commission that Smith had failed to prove an entitlement to benefits for psychological injuries stemming from his wrist accident, and the Industrial Commission adopted his findings and recommendation the same day. In his findings, Referee Taylor determined that Smith was not a credible witness because of his tendency to be intentionally untruthful, but corroborating evidence persuaded him that Smith's psychological conditions were real and genuine. Benefits were ultimately denied because, while Smith's wrist injury was a contributing factor to his psychological condition, it was not the predominate cause as required by Idaho Code section 72-451(3). The Commission denied a motion for reconsideration, wherein Smith contended that the Commission erred in discounting Dr. Rehnberg's opinion and placing more weight in Dr. Klein's. Smith was then granted a motion to dismiss his case without prejudice.

Early in 2007, Smith was referred to the Industrial Commission Rehabilitation Division (ICRD), where he was found eligible for services. Dr. Welch performed a job site evaluation of his previous plumbing job on behalf of ICRD in December 2007, and concluded that Smith could not return to his same occupation as a plumber due to psychiatric issues, but medical stability was expected within six months. In December 2008, Smith stated he was applying for a position with Check 'N Go, and ICRD gave him a list of job leads and some example resume formats. In June 2008, Smith cancelled services with ICRD because he did not wish to pursue employment at that time, reporting that he planned to admit himself to an inpatient mental hospital. The final outcome of his ICRD case detailed Smith as being medically stable with a 9% left upper extremity permanent partial impairment with no permanent restrictions or limitations.

In December 2008, Smith was awarded social security disability benefits, backdated to April 2008. In August 2009, Smith registered for classes with North Idaho College in Coeur

5

d'Alene with the assistance of the Idaho Division of Vocational Rehabilitation (IDVR). He was given a dictation program and a computer to assist him in college due to his self-reported wrist pain. He was able to complete 47 college credits towards an associate's degree and only needs 13 additional credits to obtain it. Smith cancelled treatment with Regional Mental Health Services on October 31, 2009, because he thought that there was nothing more mental-health therapy could accomplish for him.

In February of 2011, Smith sought counseling from North Idaho College for grieving and marital problems, where he was seen four times by a counselor. He also went to the emergency department and was prescribed anti-anxiety medication after finding out that his wife had been having an extra-marital affair. During his last meeting with the counselor in March of 2011, Smith was encouraged to go to a hospital. His wife abandoned him soon thereafter, leaving him to fend for himself with his two children. During this time, he withdrew from his English class and failed his Algebra and Chemistry classes. Stricken with grief, he relocated with his two children in early 2012, to Apple Valley, California, to live with his mother and siblings.

Upon moving to California, Smith was voluntarily committed to a San Bernardino Mental Hospital at the suggestion of his family. Dr. Geetha Puri, M.D., diagnosed Smith with major depression caused largely by the stress of being separated from his wife. Another M.D. in San Bernardino, Dr. Trilok Shah, diagnosed him with major depressive disorder due to chronic pain from a previous fall injury and marital conflict. Smith was treated with medications and released three days later. He was thereafter counseled by Dr. Puri and a psychiatrist with Desert Behavioral Health with regular counseling sessions.

In January 2012, Smith filed a worker's compensation complaint against the Industrial Special Indemnity Fund (ISIF) for being totally and permanently disabled due to a combination of his 1997 bilateral broken heels, his 2007 left wrist injury, and his pre-existing psychological issues, education level, and age. Smith's lawyer scheduled a functional capacity evaluation (FCE) for Smith with a company in California called Safety Works, in an attempt to find out what physical limitations Smith currently suffered from. The FCE report featured raw data from tests conducted on Smith's grip strength, lifting strength, and standing and walking ability, among other things. The report also had an unsigned Physician's Return-to-Work Voucher Report that concluded Smith could return to work with certain restrictions: (1) he could only grasp with his left hand for a total of 4 to 6 hours a day, and (2) he could not lift or carry at a

height of 3 to 6 feet of an undisclosed weight for more than 1 hour a day. The FCE report also concluded that Smith could return to his regular plumbing occupation with the limitations listed above.

A hearing was held before Referee Brian Harper on May 17, 2016, to determine whether Smith was totally and permanently disabled, and whether ISIF was liable under Idaho Code section 72-332. At the beginning of the hearing, exhibits were admitted, including the employability reports of both Dan Brownell, the vocational expert for Smith, and William Jordan, the vocational expert for ISIF. However, a dispute arose over the admission of ISIF's proposed Exhibit 17 that was handed to the Referee the morning of the hearing and was not disclosed to Smith during discovery. Smith objected to the admission of Exhibit 17 on the grounds that he had never seen the document before. Referee Harper suggested the possibility that Smith's lawyer had sent the document to ISIF's lawyer at some point, but Smith's lawyer responded that he would have to investigate if that were true (there was a possibility that the document came from the employer/surety). Smith's lawyer objected and stated that he would have attempted to track down the author of the report, Dr. Thaworn Rathana-Nakintara, an M.D., board-eligible psychiatrist, and attempt to get a copy of her notes, a copy of her education and training, and speak with other psychologists and counselors that Smith has interacted with to obtain their opinions of the reliability of the contents of Exhibit 17. Referee Harper excluded Exhibit 17, but kept a physical copy of it in case of an appeal, stating, "I will not consider it, I haven't read it, I don't intend to."

At the hearing, Smith testified about his life in California. He explained that he lives in solitude and isolation over the fear of being asked about what he "does for a living." His days are spent taking his children to school, going to the library, and people watching. He lives in a duplex in Apple Valley, living only off the income from his Social Security Disability. Smith also explained that he was not at Safety Works for the 7.5 hours as reported on the FCE report, but was actually at the location for less than an hour. He also testified that he was not actually tested for his standing, walking, or climbing abilities. However, he also testified that he had not applied for a job since residing in California, had only been to the community college in the area once, and had only contacted the California Vocational Rehabilitation Department a few weeks before the hearing. He also had stopped attending mental health treatment because of a change in his health insurance, but was smoking medical marijuana that was prescribed to him by a doctor

7

for chronic pain, insomnia, situational stress, and other ailments. Smith stated that he was very hopeful that he could return to the work force with the help of a vocational rehabilitation specialist in California.

Dan Brownell, a vocational rehabilitation specialist, was deposed post-hearing regarding his admitted employability report. Brownell was of the opinion that it was futile for Smith to attempt to even look for work because of his pre-existing physical limitations combined with his psychological condition. He explained that but-for these psychological and physical limitations caused and exacerbated by Smith's industrial work injury, he could "once again tap into his ambition and strong work ethic once again and obtain employment." Brownell stated that the wrist and grip testing on the FCE seem consistent with Smith's past medical history, but he did not rely on the FCE in making his determination because he was not familiar with California FCEs and Smith's FCE appeared inconsistent. He did admit that if the FCE were valid, Smith would be able to perform medium duty work, and that the medical records he was relying on in his report were almost ten years old.

William Jordan, a vocational rehabilitation specialist hired by ISIF, came to the opposite conclusion: "there is no combination of pre-existing impairment with the subsequent injury to cause total disability." Jordan's report stated that no doctors had given any permanent restrictions limiting his ability to work physically, and his counselors had suggested that employment would alleviate many of his psychological issues. In his report, Jordan explained that if he were to rely on Smith's self-reported disabilities, he would likely be incapable of any type of employment; however, due to Smith's "fidelity issues" with providers and others, Jordan discounted Smith's perceptions and attempted to "sort out the issues." Jordan also used the FCE report to conclude that Smith's ability to use his wrist had worsened, but overall the FCE reflected that Smith did not have any physical limitations that would render him incapable of work. Jordan's opinion was that employment-wise, Smith is young enough for re-training, that he is close to an associate's degree and intelligent enough to obtain it, that he is personable, and that he has demonstrated an ability to learn a skilled trade. With these skills and the size of the Apple Valley, California job market, Jordan reported that it would not be futile for Smith to seek employment.

At the beginning of Jordan's post-hearing deposition, Smith's attorney objected to Jordan making any references to his employability report—admitted Exhibit 16—that referenced any portion of excluded Exhibit 17. Exhibit 16, Jordan's Employability Report, provided detailed

summaries of Smith's medical history, including (as Smith's attorney details in his objection) the contents of the report of Dr. Thaworn Rathana-Nakintara, M.D., in Exhibit 17. Jordan utilized Dr. Thaworn Rathana-Nakintara's report as evidence that Smith was employable, because she concluded that "[Smith] would have no difficulties to be able to perform work activities on a consistent basis without special or additional supervision." Jordan used her findings to conclude that, "The most recent psychiatric evaluation outlines the Evaluee is capable of working with respect to his psychological condition."

Referee Brian Harper issued his Findings of Fact, Conclusions of Law, and Recommendation on July 7, 2017, and the Industrial Commission adopted it the same day. Referee Harper considered the findings and exhibits from the previous hearing, and also overruled all objections made during the depositions. After considering all the evidence before him, Referee Harper concluded that Smith failed to prove he is totally and permanently disabled under both the 100% method and the odd-lot worker method because he is not totally disabled due to his wrist and ankle injuries alone, and his psychological problems appear to be a treatable, temporary condition. In arriving at this conclusion, Referee Harper relied on Jordan's Employability Report and stated, "Claimant's most recent psychiatric evaluation shows that from a psychological standpoint Claimant is able to work without limitations." A footnote was affixed to this statement, wherein Referee Harper distinguished properly considering Exhibit 16—Jordan's Employability Report—from excluded Exhibit 17:

> The report referenced was prepared by Thaworn Rathana-Nakintara, M.D., on April 22, 2014. ISIF inadvertently failed to include this report with its exhibits, and discovered the mistake shortly before hearing. Claimant objected to the report's inclusion as part of ISIF's exhibits, since it was not disclosed as an exhibit in a timely fashion. The objection was sustained and the document was not admitted as a stand-along exhibit. However, Mr. Jordan, as a qualified expert, is entitled to rely upon the report, and the undersigned is entitled to rely on Mr. Jordan's findings, even with regard to the report in question. Experts may rely on inadmissible materials if they are of a type typically relied upon by experts in their field of expertise. IRE 703. This report so qualified and the undersigned finds the probative value of the report in the context of Mr. Jordan's analysis substantially outweighs its prejudicial effect. The report is not considered or relied upon by the undersigned independently of Mr. Jordan's analysis, but Mr. Jordan's analysis will be considered in its entirety.

Referee Harper also addressed the disputed FCE and outlined Smith's contentions with its accuracy and validity. Due to Smith's fabrications and falsehoods, Referee Harper disregarded Smith's testimony about the testing behind the FCE. However, he did find that "[t]he

9

FCE appears to be internally inconsistent, or if it is not inconsistent, its unfamiliar form makes it difficult to accurately interpret." He concluded that he would only consider the raw data in the report:

> Since no one familiar with the report was deposed, the Referee is left to interpret it to the best of his ability.
>
> . . .
>
> The unsigned voucher will not be considered, nor will conclusions in the report which show Claimant's predicted abilities over a six to eight hour workday. The raw data, including grip strength, lifting ability, shoulder and back movement ranges, and ankle range of movements, will be considered as that data carries more weight than Claimant's subjective comments to the contrary.

Later in his findings, Referee Harper noted that Smith's major impediment to employment is his temporary psychological condition because "Mr. Jordan notes that physically [Smith] has the ability to work, as borne out by the medical, psychological, and FCE raw data records."

On July 27, 2017, Smith filed a motion to reconsider with the Industrial Commission, arguing that Referee Harper erred in considering the contents of excluded Exhibit 17 and perhaps violated the canons of judicial conduct, that he exceeded his authority by interpreting the raw data found in the FCE report, and that the evidence presented showed Smith was totally and permanently disabled. The Industrial Commission denied the motion. The Commission began its reasoning by explaining that the only reason Exhibit 17 was excluded was because of a possibility that Smith had not been provided the document during discovery; but, "it seems quite possible that the document did in fact originate in a discovery response by Claimant" because of Smith's failure to challenge ISIF's statement in a response brief claiming the exhibit had in fact been provided by Smith through discovery. However, the exclusion and admissibility of Exhibit 17 was "much ado about very little" because Referee Harper was relying on the contents of Exhibit 16, which was admitted without objection at the May 17, 2016 hearing. Even if the reliance on Exhibit 16 and Referee Harper's overruling of Smith's objections during Jordan's deposition were error, the Commission determined it would be harmless error because of the overwhelming amount of evidence supporting Jordan's conclusions.

The Commission next addressed Referee Harper's reliance on, and interpretation of, the disputed FCE. It discussed its puzzlement at why Smith would challenge the Referee's reliance on this report since it is the only medical evidence that arguably supported any permanent restrictions or limitations in Smith's working capacity. However, the Commission concluded that

10

it did not believe Referee Harper erred in deciding to rely on the raw data to inform his judgment of Smith's limitations and restrictions. In regards to Referee Harper's impartiality, the Commission stated that, "Having thoroughly considered the Referee's original proposed decision, we discern nothing in his analysis or tone to permit the inference that the Referee was arbitrary or capricious."

Smith timely appealed.

## II.    ISSUES ON APPEAL

**A.** Whether the Commission erred in determining Smith was not totally and permanently disabled under Idaho Code section 72-332.

**B.** Whether the Referee improperly utilized an excluded exhibit.

**C.** Whether the Referee improperly interpreted an FCE.

**D.** Whether the Referee properly determined disability at the time of the hearing.

## III.    STANDARD OF REVIEW

"When reviewing a decision by the Industrial Commission, this Court exercises free review over the Commission's conclusions of law, but will not disturb the Commission's factual findings if they are supported by substantial and competent evidence." *Aguilar v. Indus. Special Indem. Fund*, No. 45581, 2019 WL 1187120, at \*4 (Idaho Mar. 14, 2019) (citing *Green v. Green*, 160 Idaho 275, 280, 371 P.3d 329, 334 (2016)).

> Substantial and competent evidence is relevant evidence that a reasonable mind may accept to support a conclusion. Substantial and competent evidence is more than a scintilla of evidence, but less than a preponderance. [This Court] will not disturb the Commission's conclusions on the weight and credibility of the evidence unless those conclusions are clearly erroneous.

*Id.* (citing *Hope v. Indus. Special Indem. Fund*, 157 Idaho 567, 570–71, 338 P.3d 546, 549–50 (2014)). "This Court freely reviews the Commission's interpretation of the workers' compensation statutes." *Id.* All facts and inferences are viewed "in the light most favorable to the party who prevailed before the Commission and liberally construes the provisions of the worker's compensation law in favor of the employee, in order to serve the humane purpose for which the law was promulgated." *Hamilton v. Alpha Servs., LLC*, 158 Idaho 683, 688, 351 P.3d 611, 616 (2015) (internal citations omitted). We will not reweigh the evidence or consider whether we would have reached a different conclusion than the Commission from the evidence presented. *Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 735, 40 P.3d 91, 93 (2002).

## IV. ANALYSIS

Smith's overall contention with the Commission's order is that it is not supported by substantial and competent evidence. However, a number of other issues are raised in how the Commission arrived at its determination that must first be addressed: (1) whether the Referee improperly utilized an excluded exhibit in making its findings of fact, and whether the Referee acted impartially and the Commission casted aspersions towards Smith; (2) whether the Referee improperly interpreted an FCE; and (3) whether the Referee properly determined disability at the time of the hearing. We hold that the Referee and Commission acted properly, and the Commission's order was supported by substantial and competent evidence.

### 1. The Referee and Commission did not improperly utilize an excluded exhibit or cast aspersions.

Smith argues that the Referee considered the contents of proposed Exhibit 17, and his doing so constituted prejudicial error that tainted the hearing and his recommendations. He also argues that the Referee, ISIF, and the Commission resorted to matters outside of the record and attacked the integrity of Smith's lawyer to cover up their misdeeds. ISIF responds that no error occurred because proposed Exhibit 17 should have been admitted, the Referee specifically noted that he did not rely on it in making his determination, and that even without the references to Exhibit 17 in Exhibit 16, Jordan's opinion would still remain the same.

During the May 17, 2016 hearing, after the introduction of both party's exhibits, ISIF attempted to introduce a report by Dr. Thaworn Rathana-Nakintara, M.D., dated April 22, 2012. Smith's lawyer objected to the admission of the document because he personally had never seen the document before and it was not disclosed within 10 days of the hearing as required by Judicial Rules of Practice and Procedure Rule 10. The Referee suggested that if it was sent by Smith's lawyer to ISIF, then it must have been compiled by someone in Smith's lawyer's office. Both lawyers represented to the Referee that they were unsure of where the document originated, but Smith's lawyer stated that if he had known of the report being admitted, he would have attempted to obtain a copy of Dr. Rathana-Nakintara's notes and her education and training, and would have spoken "with the numerous other psychologists and counselors that Mr. Smith has interacted with subsequent to this time in April of 2012 to vet the statements and reliability of this report." Referee Harper then excluded proposed Exhibit 17 and explained that he would not rely on it or even read it, but that he would keep a copy of it in case of appeal.

12

While proposed Exhibit 17 was excluded, Exhibit 16—William Jordan's Employability Report—was admitted without objection. In Jordan's report, he summarizes the contents of Dr. Rathana-Nakintara's report as he does with many other reports. He also outlines Smith's placeability assets and states that the "[m]ost recent psychological exam" revealed no limitations to working a regular job, and he quotes extensively from his summary of Dr. Rathana-Nakintara's report. Under a section entitled Access to Labor Market and Potential Wage Loss Calculations, Jordan states:

> The most recent psychiatric evaluation completed on 4/22/14 (sic) by Thaworn Rathana-Nakintara, M.D. for the Department of Social Services Disability and Adult Programs, San Diego CA.): reflect that 'based on objective findings presented during interview, the Claimant [would have no limitations handling gainful employment as outlined in the first summary] . . . Based on his statements during the vocational interview, he once again appears to be in the continuing the pattern of perceived helplessness with an inability to get out of the cycle of non-movement.

In the Analysis of Permanent Disability Opinion(s) section, he states in the middle of a lengthy paragraph that, "The most recent psychiatric evaluation outlines the Evaluee is capable of working with respect to his psychological condition." Attached at the end of the report, Jordan provides a chronological outline of all the records he relied upon and what their contents entailed. He provides a bolded paragraph, dated 04/22/12, where he again outlines the contents of Dr. Rathana-Nakintara's report.

At the post-hearing deposition, Smith's lawyer objects to any references to admitted Exhibit 16:

> With regards to Mr. Jordan's report, which is May 12, 2016, I object to the references that I've been able to specifically identify at page 11, page 25, and two references at page 27 to a psychiatric evaluation of 4/22/14 and that was objected to at hearing and excluded, and so I would object to this witness utilizing any information gleaned, received from that report and any of his opinions and so to those portions contained in his report. So, that's my objection.

Later in the deposition, Jordan was asked whether he had any recommendations to make Smith more employable than he currently was at the time. He began to answer the question, but Smith's lawyer objected:

> **Jordan:** I think that he should follow the advice of his counselors. Dr. Alexander who worked with him in 2013 and continually indicated that he wanted him to go out and work with Voc Rehab and work the One-Step Program and get going in a job. And so those – that makes sense to me from what I've seen and from what I

have read from the other psychologists. It would be therapy for him to get back to work. It would help him - -

**Smith's lawyer:** Objection to the extent other psychologists includes the excluded report and information.

**Jordan:** I'm not referring to that report when I say that. I'm not referring to the one that has been excluded. . . . but I can say that Dr. Kline said it would be therapy for the claimant to get back to work. Also Dr. Parkman said he feels helpless to proceed with any actions until his Work Comp case gets settled. He's paralyzed by litigation.

Referee Harper overruled Smith's lawyer's objections made during the deposition. During a detailed discussion of Jordan's report, Referee Harper stated that "Mr. Jordan also noted Claimant's most recent psychiatric evaluation shows that from a psychological standpoint Claimant is able to work without limitations . . . ." He further explained that the report Mr. Jordan relies on to make his opinion was proposed Exhibit 17, which was excluded from being an admitted exhibit due to untimeliness. However, the Referee stated that he was entitled to rely on Jordan's findings and opinions as a qualified expert, even for inadmissible materials under Idaho Rule of Evidence 703. After stating that the report's probative value in the context of Jordan's analysis substantially outweighs its prejudicial effect, Referee Harper explained, "The report is not considered or relied upon . . . independently of Mr. Jordan's analysis, but Mr. Jordan's analysis will be considered in its entirety."

Smith contends that Referee Harper, in stating that Jordan notes the report of Dr. Rathana-Nakintara along with the conclusions the Referee drew from that report, was essentially the Referee using Exhibit 16 as a "'conduit' for his consideration of and reliancy (sic) on the contents of Exhibit 17." While Smith argues multiple times in his brief that the Referee was actually relying on proposed Exhibit 17 to conclude that Smith was employable—all while using Exhibit 16 as a cover—he fails to point to a specific occurrence in the findings. Referee Harper only makes mention of Dr. Rathana-Nakintara's report during his overview of both vocational rehabilitation experts' reports. Additionally, the Referee incorrectly stated in a footnote that the report is dated 4/22/14, which is a typo carried over from Jordan's report because proposed Exhibit 17 is dated 2012. The Referee also represents that Jordan stated that Dr. Rathana-Nakintara's report is the most recent psychological evaluation, which is only drawn from Jordan's report, not from proposed Exhibit 17. The Referee did not utilize the excluded exhibit, but rather only used Jordan's report, admitted Exhibit 16, to render a conclusion: "Mr. Jordan

14

notes that physically Claimant has the ability to work, as borne out by the medical, psychological, and FCE raw data records."

Smith also argues that the Referee incorrectly exploited Idaho Rule of Evidence 703 to consider inadmissible evidence. Smith cites to *State v. Watkins*, where this Court held that an "amendment to I.R.E. 703 serves to prevent an expert witness from serving as a conduit for the introduction of otherwise inadmissible evidence." 148 Idaho 418, 427, 244 P.3d 485, 494 (2009). However, as ISIF points out, Exhibit 16 containing the summary of Dr. Rathana-Nakintara's report was *already in evidence*, admitted without any objections, when proposed Exhibit 17 was being discussed. But nonetheless, it appears the Referee correctly applied Idaho Rule of Evidence 703, which states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion or inference on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Jordan stated that he relied on "the usual and customary references, methods, and protocols" in making his conclusions in his employability report. Brownell, the other vocational rehabilitation specialist, also relied on medical and psychiatric reports to form an opinion on Smith's employability. The Referee, either to cover all bases or because he considered the contents of the report inherently inadmissible, weighed the report's probative value against the possible prejudicial effect and determined that Jordan could rely on it to make his conclusions. Contrary to Smith's assertion, Idaho Rule of Evidence 703 does not require Dr. Rathana-Nakintara, M.D., to be qualified as an expert for Jordan to rely upon her report; all that is required is that Jordan have been made aware of the report, and the report must be one that experts in the vocational rehabilitation field reasonably rely upon to form opinions. Thus, the Referee properly considered Jordan's employability report in his findings and conclusions.

With the following analysis, it is important to address other issues Smith raises in his briefings in regards to proposed Exhibit 17. Smith argues that Jordan was rendering a psychological opinion in his report, but nothing in Jordan's report or testimony indicates that he was rendering anything other than an opinion on Smith's employability. It also does not appear to be error for the Referee to "*sua sponte* utilize Rule 703," because he was doing so in response

to objections made during the post-hearing deposition of Jordan. Furthermore, Smith argues that the Referee's error in relying on the excluded exhibit, "and asserting that Mr. Jordan had also, was compounded by the fact that Mr. Jordan testified that he was not referring [to] Exhibit 17 in his opinions and testimony." This assertion misrepresents the facts; during Jordan's deposition, he stated that he was not relying on Dr. Rathana-Nakintara's report in forming a *specific opinion* that past psychiatrists and counselors have suggested it would be therapeutic for Smith to return to work. Therefore, the Referee did not err—and was certainly not partial or unethical—in using Jordan's Employability Report and testimony to find that Smith had failed to prove he was totally and permanently disabled.

Smith also complains of the Commission casting aspersions and inappropriately chastising him in its order denying his motion for reconsideration. After describing the confusion at the hearing regarding the source of proposed Exhibit 17, the Commission stated that ISIF, in its reply brief to the Commission, represented that a subsequent investigation showed proposed Exhibit 17 had originated from Smith's lawyer's office during discovery. The Commission speculated that it was possible the document had originated from Smith because he did not challenge or dispute ISIF's claim. The Commission further speculated that the Referee would have admitted the document, and that doing so would not have been inappropriate. Without commenting on the wisdom of the Commission's tangential speculation, it did not err in its ultimate conclusion that Exhibit 16 was properly used by both the Referee and Jordan, and proposed Exhibit 17 was not used by the Referee in making his findings.

The last contention in regards to Exhibit 17 is Smith's argument that the Commission and the ISIF were conspiring against him. In its reply brief, ISIF stated that "It was Claimant who initially located and produced the exhibit and obviously knew about it but chose not to include the exhibit as part of its set of exhibits." Because ISIF did not address the Commission's statement that ISIF affirmatively represented that a subsequent investigation took place—but instead "leveled [an] unfounded allegation" that Smith violated a rule of professional conduct— Smith asserts that "It could reasonably be hypothesized that ISIF would have preferred that the Commission not have made it appear that an ex parte communication had taken place at which the facts asserted by the Commission were relayed to it."

When this issue is examined purely in a legal light—with the speculative affrays set aside—the Commission did not err in adopting the Referee's findings and recommendation. At

the hearing, Exhibit 16 was admitted without objection. Exhibit 16 contained summaries of reports Jordan properly relied upon in rendering an opinion on Smith's employability. The Referee properly discussed Idaho Rule of Evidence 703 in overruling Smith's objection to Jordan's prior reliance in Exhibit 16 with Dr. Rathana-Nakintara's report that happened to corroborate what was found in proposed Exhibit 17. Therefore, the Referee did not err in considering Jordan's reliance on the report, and the Commission did not err in adopting the Referee's findings.

### 2. The Referee did not improperly consider the FCE.

Smith contends that the Referee exceeded his authority as fact-finder by interpreting a Functional Capacity Evaluation (FCE) report. However, ISIF argues that the Referee merely reviewed the report as an admitted exhibit, as he had the right to do as a fact-finder. Both parties cite to *Mazzone v. Texas Roadhouse* to support their position. 154 Idaho 750, 302 P.3d 718 (2013).

In *Mazzone*, this Court explained that a fact-finder may not use his own expertise to render unqualified opinions. *Id.* at 759, 302 P.3d at 727. A referee in *Mazzone* used a DSM-IV-TR manual not in evidence to make unqualified medical opinions and to exclude from evidence opinions she disagreed with. *Id.* This Court clarified the line between properly relying on a manual to weigh the opinions of experts, and using a manual to render unqualified opinions:

> The referee did not merely use the manual to weigh the methodologies of two qualified doctors. Rather, she used her own understanding of the manual and its requirements to determine that [two experts] had improperly diagnosed [Claimant]. Where there is both a positive and negative diagnosis between two qualified doctors, the fact finder may examine the methodologies of both physicians to determine which physician is more credible. However, to use one's own lay understanding of a medical document, which requires specialized expertise to understand and interpret, to conclude that a person with that specialized knowledge improperly made a medical diagnosis is improper.

*Id.* at 759–60, 302 P.3d at 727–28. A referee may not use a manual to construct unqualified opinions, but a referee may look at a "manual to weigh the methodology of conflicting medical experts." *Id.* at 759, 302 P.3d at 727.

In this case, *Mazzone* appears to offer little guidance in determining whether the Referee improperly interpreted the FCE. Here, the Referee noted that the FCE appeared to be internally inconsistent because of the conclusions reached in the report when compared with the raw data, but then attempts to interpret the FCE:

It does appear the document is inconsistent to the extent that the conclusions are not entirely supported by the raw data. Most notably, the lifting invalidity conclusion appears to conflict substantially with the testing data. The data itself appears legitimate, but when the data is incorporated into conclusions inconsistencies emerge. For example, the "validity testing" data in the report shows a zero percent coefficient of variation, and thus a valid effort designation, DE 14, p. 0164, but the conclusion somehow morphs the lifting test results into being "invalid." Other notations in the raw data section of the report are detailed and support the proposition that the testing was actually performed . . . The unsigned voucher will not be considered, nor will the conclusions in the report which show Claimant's predicted abilities over a six to eight hour workday. The raw data, including grip strength, lifting ability, shoulder and back movement ranges, and ankle range movements, will be considered as that data carries more weight than Claimant's subjective comments to the contrary.

His "interpretation" of the report is merely a review of the document and a rejection of almost its entirety. Brownell—Smith's vocational rehabilitation specialist—discounted the FCE, but stated that the wrist measurements seem valid, and Jordan—ISIF's specialist—utilized the FCE results in his employability report to discount Smith's self-reported abilities. The Referee's statement at the end of his "interpretation" suggests that he is considering the raw data as evidence to discount Smith's subjective complaints of his physical abilities ("as that data carries more weight than Claimant's subjective comments to the contrary."). The only other conclusion that he makes with the FCE raw data scores is adopting Jordan's opinion that Smith's major impediment is his psychological condition, not his physical conditions ("Mr. Jordan notes that physically claimant has the ability to work, as borne out by the medical, psychological, and FCE raw data records."). Thus, the Referee reviewed the report, as he has the right to do as fact-finder, and used it to adopt Jordan's expert opinion on Smith's employability. He did not use it to make unqualified medical opinions.

3. **The Commission properly determined disability at the time of the hearing.**

Smith argues that the Commission determined his disability in the future, rather than at the time of the hearing. He also argues that the Commission did not consider his psychological impairments as a personal circumstance in determining disability.

An evaluation of permanent disability "is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors as provided in section 72-430, Idaho Code." I.C. § 72-425. Smith's contention is that the Commission ignored the fact that he was permanently disabled at the time of the hearing when it concluded, "Claimant's psychological

18

overlay is a significant disability, which if not treated would make it difficult for Claimant to pursue employment." However, the Commission *was* determining that Smith had failed to prove he was totally disabled at the time of hearing by considering the evidence brought before it at the time of hearing. Specifically, the Commission concluded: "While the record contains more than one expert opinion that Claimant will have a difficult time finding employment unless and until his psychological issues are treated, no expert has opined that Claimant's psychological condition is not treatable, *and therefore a stable, permanent barrier to employment*." Said differently, Smith did not present any evidence that his psychological condition was more probable than not a permanent condition. If this Court were to adopt Smith's contention that present disability must be considered in a vacuum at the date of the hearing, a claimant could sprain both ankles while walking into a hearing and be considered totally and permanently disabled, even though his ankles would heal in due course. The Commission properly determined disability at the time of the hearing.

Next, Smith argues that the Commission did not consider his psychological impairment as a personal circumstance. The Commission concluded that Smith's psychological impairment was a temporary, treatable condition, and therefore, it could not be considered as one of the combining factors under Idaho Code section 72-332. Idaho Code section 72-322(2) states that an impairment must be a permanent condition. Smith cites to *Mapusaga v. Red Lion Riverside Inn*, for the proposition that, "[w]here a psychological condition is not compensable as a result of an industrial accident, it is to be treated as a personal circumstance which is correctly included in allocating responsibility between the ISIF and the employer/surety." 113 Idaho 842, 849, 748 P.2d 1372, 1380 (1987) (overruled on other grounds).

*Mapusaga* stands for the proposition that a psychological disorder lacking physical manifestations can be treated as a nonmedical factor under Idaho Code section 72-425. *Id.* at 850, 748 P.2d at 1380. Idaho Code section 72-425 mandates an appraisal of a claimant's present and probable future ability to engage in employment "as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors [as] provided in section 72-430, Idaho Code." Idaho code section 72-430(1) lists certain nonmedical factors to consider in determining percentages of permanent disabilities:

> account shall be taken of the nature of the physical disablement, the disfigurement if of a kind likely to limit the employee in procuring or holding employment, the cumulative effect of multiple injuries, the occupation of the employee, and his age

19

at the time of accident causing the injury, or manifestation of the occupational disease, *consideration being given to the diminished ability of the afflicted employee to compete in an open labor market within a reasonable geographical area considering all the personal and economic circumstances of the employee*, and other factors as the commission may deem relevant, provided that when a scheduled or unscheduled income benefit is paid or payable for the permanent partial or total loss or loss of use of a member or organ of the body no additional benefit shall be payable for disfigurement.

(emphasis added).

Smith's contention that the Commission failed to consider his psychological impairment is misplaced. The Commission properly understood that Smith's psychological impairment could not be used to determine liability under Idaho Code section 72-332(2), or Idaho Code section 72-425, because it found that Smith presented no evidence that his condition was permanent. Since Smith failed to show he is totally and permanently disabled, the Commission properly disregarded his temporary and treatable psychological impairment in determining his permanent impairment.

> **4. The Commission did not err in determining Smith failed to prove that he is totally and permanently disabled.**

Smith appeals from the Commission's determination that he failed to prove total and permanent disability. Whether a claimant is totally and permanently disabled is a question of fact that may be proven by one of two ways. *Magee v. Thompson Creek Mining Co.*, 142 Idaho 761, 764, 133 P.3d 1226, 1229 (2006). The first way is the 100% method, which requires a claimant to prove that his medical impairment and non-medical factors caused him to become 100% disabled. *Sevy v. SVL Analytical, Inc.*, 159 Idaho 578, 585, 364 P.3d 279, 286 (2015). The second way is the odd-lot worker method, which requires a claimant to prove that they "are so injured that they can perform no services other than those that are so limited in quality, dependability or quantity that a reasonable stable market for them does not exist." *Rodriguez v. Consol. Farms, LLC*, 161 Idaho 735, 740, 390 P.3d 856, 861 (2017) (internal citation omitted).

> *i.  The Commission's determination that Smith failed to prove he was totally and permanently disabled under the 100% method is supported by substantial and competent evidence.*

Smith argues that the Commission's determination that he failed to prove he was 100% disabled is not supported by substantial and competent evidence. ISIF responds that Claimant is clearly not 100% disabled because no medical provider has indicated Smith cannot return to the workforce.

The Commission determined that Smith was not 100% disabled because the physical injuries to his wrists and heels were medically stable at the time of hearing, with permanent impairment of his upper left extremity rated at 9%, and his heel fractures being rated at 22% impairment for the left lower extremity, and 10% impairment for the right lower extremity. It also noted that "No physician has opined [Smith] is permanently incapable of employment . . . no expert has opined that [Smith's] psychological condition is not treatable, and therefore a stable, permanent barrier to employment." Smith himself even testified that he was very hopeful he could return to employment with vocational rehabilitation assistance, and that he would likely be able to finish obtaining his college degree. The Commission concluded that Smith failed to prove total and permanent disability under the 100% method because, "With proper psychological treatment, it is more likely than not that Claimant would or should be able to find employment in the Apple Valley, California labor market."

The Commission's findings and conclusions are supported by substantial and competent evidence. "Substantial and competent evidence is 'relevant evidence that a reasonable mind might accept to support a conclusion.'" *Huff v. Singleton*, 143 Idaho 498, 500, 148 P.3d 1244, 1246 (2006) (citing *Jensen v. City of Pocatello*, 135 Idaho 406, 412, 18 P.3d 211, 217 (2000)). Dr. McNulty gave Smith a permanent rating of 22% for his lower-left extremity impairment and a rating of 10% for his lower right extremity in 2015, after reviewing his medical records and depositions. In 2007, Dr. Welch rated Smith's wrist at 9% permanent impairment and opined that he was fixed and stable.

In regards to Smith's psychological issues, there exists substantial and competent evidence in the record to support the Commission's determination that with proper psychological treatment it is more likely than not that Smith would or should be able to find employment in the Apple Valley, CA, labor market:

- Dr. Welch stated, that Smith would not be able to return to work until his psychiatric issues were addressed, but he expected them to be remediated within six months.
- Dr. Klein concluded that no ratable permanent impairment exists for Smith's psychological issues, and they could be treated by returning to work.
- Dr. Rehnberg opined that Smith could be treated with counseling or therapy, and that he is young and smart enough to go through a vocational rehabilitation program and return

21

to the workforce. Additionally, he suggested that Smith's psychological health could be remediated through vocational rehabilitation.

- Dr. Parkman opined that Smith's mental health recovery was being complicated by ongoing litigation and marijuana use.

- Smith testified that he was very hopeful that he could return to the workforce with the assistance of California vocational rehabilitation, and that he would finish obtaining his college degree if a vocational rehabilitation specialist instructed him to do so.

Smith argues that he is 100% disabled because the Idaho Department of Vocational Rehabilitation determined that Smith's work history and educational background prevented him from obtaining employment without the assistance of vocational rehabilitation, and that Smith is significantly disabled. He also argues that Brownell's testimony that Smith needed treatment to return to work, combined with Smith's subjective outlook on life and the fact that Smith had not yet received adequate treatment at the time of the hearing, should have led the Commission to determine Smith was 100% disabled. However, Smith is asking this Court to disturb the Commission's conclusions by reweighing the evidence; this Court will uphold the Commission's conclusions as long as they are supported by substantial and competent evidence and not clearly erroneous. Therefore, we affirm the Commission's determination that Smith failed to prove he was 100% disabled.

> ii. *The Commission's determination that Smith failed to prove he was totally and permanently disabled under the odd-lot worker method is supported by substantial and competent evidence*

> Claimants may prove that they are totally and permanently disabled by demonstrating that they fit within the definition of an odd-lot worker. The odd-lot category is for those workers who are so injured that they can perform no services other than those that are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist. Such workers need not be physically unable to perform any work at all. They are simply not regularly employable in any well-known branch of the labor market absent a business boom, the sympathy of a particular employer or friends, temporary good luck, or a superhuman effort on their part. If the evidence of the medical and nonmedical factors places a claimant prima facie in the odd-lot category, the burden is then on the employer or surety to show that some kind of suitable work is regularly and continuously available to the claimant.

*Gooby v. Lake Shore Mgmt. Co.*, 136 Idaho 79, 83, 29 P.3d 390, 394 (2001) (citing *Lyons v. Industrial Special Indem. Fund*, 98 Idaho 403, 565 P.2d 1360 (1977)). A prima facie case may be made by establishing:

(1) A claimant has attempted other types of employment without success; or

(2) A claimant or vocational counselors or employment agencies have searched for other work and other work is unavailable; or

(3) That it would be futile to attempt to find suitable work.

*Id.* (citing *Dehlbom v. Industrial Special Indem. Fund*, 129 Idaho 579, 930 P.2d 1021 (1997)).

Smith argues that he made a prima facie case that he was an odd-lot worker under the second and third odd-lot worker prongs, and that the burden should have shifted to ISIF to rebut his showings. He does not argue that he is an odd-lot worker under the first prong.

      a.   <u>Smith did not establish a prima facie odd-lot worker case under the second prong.</u>

Smith contends that he established a prima facie case under the second prong of the odd-lot worker method, but the Commission inexplicably and erroneously asserted that Smith only attempted to meet his burden under the third prong. In his briefing for the 2016 hearing, Smith argued that he satisfied the second prong of the odd-lot worker method. However, in his reply brief to the Commission, he seems to narrow his argument to only the third prong when he states: "As to the Odd-Lot Doctrine category, the opinions of Mr. Brownell and Mr. Jordan that it would be futile for Claimant to find work 'is sufficient to establish Claimant's status as an odd-lot worker under the third prong.'" Additionally, in both his motion to reconsider and in his reply brief for his motion for reconsideration, he fails to argue that the Commission erred by only considering the third prong of the odd-lot worker method, even though he discussed the odd-lot worker doctrine in depth.

Nevertheless, Smith argues on appeal that he established a prima facie case for the second prong of the odd-lot worker method because his wife testified at the 2008 hearing that Smith had "gone up and down the boulevard and filled out applications, to no avail." He also argues that the Idaho Department of Vocational Rehabilitation found that Smith had a substantial impediment to employment, and they sought out jobs on his behalf. Because no employment was ever found for him, he contends that he met his prima facie case and the burden to rebut his case should have shifted to ISIF.

However, as ISIF argues, Smith failed to present any substantial evidence that work was actually sought for him and that it was unavailable. Smith had assistance writing a resume, but he testified he never actually submitted it to any employers. He also testified that he did not fill out applications at jobs in the area because of anxiety and depression surrounding questions regarding his lifting ability. In his interview with Jordan, Smith stated that the nearest he has come to finding a job was sitting down with a pest control company, but leaving in tears when asked about his last employer. Additionally, since moving to California in 2012, Smith has testified that he has not looked for employment and that he signed up for vocational rehab only a couple weeks before the 2016 hearing. The Commission noted in the findings of fact that "For years, Claimant has not attempted to find work to any significant degree."

It seems the only evidence that nears a prima facie case is Smith's wife's testimony concerning his search for work after the 2008 hearing. However, her solitary statement does not establish a prima facie case. In examining the entirety of the record, Smith failed to meet the burden of establishing a prima facie odd-lot worker case under the second prong.

        b.   <u>Smith did not establish a prima facie odd-lot worker case under the third prong.</u>

The last prong—whether it would be futile for Smith to seek employment—is where the primary contention lies between the parties. Smith argues that through his vocational rehabilitation specialist, Brownell, and through the Idaho Department of Vocational Rehabilitation, he made a prima facie showing that it would be futile for him to seek employment. ISIF replies that Smith is the epitome of someone who is not an odd-lot worker under the third prong because he is 44 years of age, almost has a college degree, has demonstrated an ability to learn a skilled trade, and he is in a good labor market in Apple Valley, California.

Brownell, who was directly involved in Smith's vocational rehabilitation case, opined that it would be futile for Smith to seek employment:

> It is my opinion to a reasonable degree of vocational probability that Mr. Smith's physical limitations caused by his traumatic industrial wrist injury, when combined with his pre-existing physical limitations due to his heel injuries and his pre-existing psychological condition as impacted by his industrial injury, are of such a disabling nature that he has no reliable access to jobs in either Coeur d'Alene or the Apple Valley labor markets. Given the combined magnitude of Mr. Smith's physical limitations and psychological condition, it is my opinion to a reasonable degree of vocational probability that there is no reasonable likelihood

24

that Mr. Smith would be able to obtain employment in any labor market that may be considered. It is my opinion to a reasonable degree of medical probability that Mr. Smith's attempts to find employment were, and will continue to be (barring the occurrence of some unforeseen resolution of his psychological condition) futile in the absence of sheer luck in discovering an extraordinarily sympathetic employer.

Additionally, Smith points to vocational rehabilitation documents that were of the opinion he could not find suitable employment without vocational rehabilitation assistance.

Jordan, on the other hand, opined that it would not be futile for Smith to continue seeking work:

Certainly, if one relies on the Evaluee's perception of his capacity and his psychological status, it is not likely he would be capable of any forms of employment . . . That said, there are no medical opinions in the file information that reflects the Evaluee is incapable of working . . . The Evaluee himself has indicated that he felt he could do the Service Manager work (if he did not have to go out into the field.) Those types of opportunities exist, especially in the Evaluee's current California labor market. In addition, there are a number of other types of occupations for which he would be qualified to perform such as plumbing and construction material supply sales, customer service work, etc.

Additionally, at the 2016 hearing, Smith testified that he was very hopeful he would obtain employment with the assistance of vocational rehabilitation services.

In the Commission's findings, it notes that "[n]o physician imposed restrictions of such magnitude that it would be futile for Claimant to even *attempt* to find work." The Commission then overviewed how Dr. Klein opined that it would be therapeutic for Smith to return to work, and how Dr. Parkman discussed how ongoing litigation and marijuana use were complicating Smith's psychological recovery—his only significant barrier to employment. After discussing how both vocational rehabilitation experts opined that Smith's largest hurdle to employment was his psychological condition, the Commission concluded that Smith had failed to meet the burden of proving that it would be futile for him to seek employment under the odd-lot worker method.

The Commission's conclusions are supported by substantial and competent evidence. As such, its conclusion that Smith failed to meet the third prong of the odd-lot worker method will not be disturbed.

## V. CONCLUSION

In light of the foregoing, the Commission's order is affirmed.

Chief Justice BURDICK, and Justices BEVAN, STEGNER and MOELLER CONCUR.

25